# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-2054V

| | |
|---|---|
| MICHELLE EDGERSON-BRIGGS,<br><br>                  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Chief Special Master Corcoran<br><br>Filed: June 4, 2024 |

*William Boyles, I, Sangisetty Law Firm, New Orleans, LA*, for Petitioner.

*Elizabeth Andary, U.S. Department of Justice, Washington, DC*, for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 21, 2021, Michelle Edgerson-Briggs filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Injury Table, after receiving an influenza ("flu") vaccine on October 15, 2020. Petition, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below, and after holding a brief hearing, I award damages in the amount of **$77,000.00**, **representing compensation for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I.     Relevant Procedural History

On June 30, 2023, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation for her SIRVA. ECF No. 25. The same day, I issued a Ruling on Entitlement and ordered the parties to engage in damages discussions. ECF Nos. 26-27. But the parties were unable to resolve their disagreement, and they proceeded to filing briefs on damages. *See,* e.g., ECF No. 31. Petitioner filed a Memorandum in support of her request for damages on August 30, 2023. ECF No. 32. On October 30, 2023, Respondent filed his Response brief. ECF No. 34. Petitioner subsequently filed her Reply brief on November 2, 2023. ECF No. 35.

In early April 2024, I proposed this case for an expedited hearing on May 31, 2024, at which time I would decide the disputed issue of damages based on all evidence filed to date and any oral argument from counsel. ECF No. 36. The parties agreed, and the "Motions Day" hearing took place as scheduled. ECF No. 37; Minute Entry dated May 31, 2024.[3] During the hearing, I made an oral damages determination. This Decision memorializes those findings and determinations.

### II.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is

---

[3] As of the date of this Decision, the transcript of the May 31, 2024 Motions Day hearing has not been filed, but my oral ruling is incorporated by reference herein.

inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See,* e.g., *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III. Prior SIRVA Compensation Within SPU[5]

#### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[6] In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination.

---

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### IV.     The Parties' Arguments

The only damages components Petitioner requests are for past and future pain and suffering. Maintaining that she continued to suffer "constant" shoulder pain and limited use of her left arm for three years post vaccination, and describing her pain as severe enough that she is unable to lift her arm above her head or lift her grandchildren, Petitioner seeks $175,000.00 for past pain and suffering. Mem. at 6-7. She favorably compares the facts and circumstances of her case to those experienced by the petitioners in *Cooper* and *Knudson,* who each received $110,000.00, and *Collado* and *Dobbins*, who received $120,000.00, and $125,000.00, respectively for their past pain and suffering.[11] *Id.* at 7-8. Additionally, Petitioner requests $25,000.00 for future pain and suffering, as her pain has continued with ongoing deficits in her ability to reach overhead. *See id.* (citing Ex. 13).

In contrast, Respondent asserts that Petitioner should receive the lesser amount of $72,500.00 for past pain and suffering only, with no future component. Response at 7. Emphasizing Petitioner's "mild and limited" injury and subsequent conservative treatment course (not requiring surgery) and totaling sixteen months, Respondent argues that the facts and circumstances more closely resemble those of the petitioners in *L.J.,* who received $80,000.00 for actual pain and suffering, and *George* and *Bartholomew*, who each received $67,000.00 for the same.[12] *Id.* at 10-11. He also maintains that this case is distinguishable from Petitioner's comparable cases - all of which were decided in 2018 by the former Chief Special Master, and where three out of four involved a petitioner who underwent surgery. *Id.* at 9. Respondent asserts that a future pain and suffering award is inappropriate in this case, as Petitioner has "failed to show any indicia of permanency" of her injury to warrant such an award. *Id.* at 12-13.

---

[11] *Cooper v. Sec'y of Health & Hum. Servs.,* No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018); *Knudson v. Sec'y of Health & Hum. Servs.,* No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018); *Collado v. Sec'y of Health & Hum. Servs.,* No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018).

[12] *L.J. v. Sec'y of Health & Hum. Servs.,* No. 17-59V, 2023 WL 2137946, at *6 (Fed. Cl. Spec. Mstr. Jan. 20, 2023); *George v. Sec'y of Health & Hum. Servs.,* No. 18-426V, 2020 WL 4692451, at *2-3 (Fed. Cl. Spec. Mstr. July 10, 2020); *Bartholomew v. Sec'y of Health & Hum. Servs.,* No. 18-1570V, 2020 WL 3639805, at *2-3 (Fed. Cl. Spec. Mstr. June 5, 2020).

## V. Appropriate Compensation to be Awarded

Here, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, affidavits, filings, and all assertions made by the parties in written documents and at the expedited hearing held on May 31, 2024. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Pursuant to my oral ruling on May 31, 2024 (which is fully adopted herein), **I find that $77,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering.**

Petitioner's medical records reveal a mild to moderate, non-surgical SIRVA. While I credit Petitioner's arguments in her affidavit (as well as those advanced during the damages hearing) regarding residual pain and restrictions with reaching overhead, which may ultimately require continued treatment (and *possibly* surgery), I cannot compare the facts of this case to other SIRVA cases where surgery did occur. Particularly significant to my decision includes the evidence demonstrating Petitioner's treatment with her PCP within fourteen days of her vaccination, subsequent treatment with an orthopedist, prescription medications (including prednisone, Robaxin, tramadol (Ex. 3 at 12); gabapentin (Ex. 4 at 3); cyclobenzaprine (Ex. 9 at 6)), an x-ray and EMG, an MRI of the left deltoid revealing normal results,[13] participation in 55 PT sessions and an HEP, and treatment with other home remedies, including heat, ice, and biofreeze. Additionally, Petitioner described consistently moderate pain ranging in severity from a 5-8/10 for the duration of her somewhat lengthy treatment course (16 total months). These facts are consistent with a mild course.

In addition, during her December 23, 2020 initial PT evaluation (and thus within approximately two months of vaccination), Petitioner had a reported pain level of 7/10, which seemed to slightly improve to a 5/10 by January 2021, with additional PT sessions. *See* Ex. 8 at 48, 51, 54 (reverse order). Petitioner's pain was consistently moderate (5/10) through early April 2021, but by the end of that month, her pain escalated to a 7-8/10,

---

[13] An April 16, 2021 MRI of Petitioner's C-spine showed disc space narrowing at C5-6 and C6-7 with anterior osteophytic spurring; a disc bulge at C3-4; uncovertebral spurring with a traction disc bulge; early facet hypertrophic changes; and mild right and moderate to severe left neural foramen narrowing at C5-6; a disc bulge at C6-7; and a 7.6mm left thyroid nodule. Ex. 5 at 4-5. Petitioner was diagnosed with cervical disc disease on May 3, 2021, and she underwent subsequent treatment. Ex. 8 at 25-27.

7

where it remained throughout her first round of PT – through June of the same year. Ex. 12 at 52. When Petitioner returned for her second round of PT on September 27, 2021 (and thereafter), her medical records do not contain similar descriptions of pain on a ten-point scale. *See,* e.g., *id.* at 49. Nonetheless, these earlier notations indeed support a moderate SIRVA within the first months of onset.

Petitioner did experience reduced ROM that was demonstrated soon after vaccination, and that lasted throughout Petitioner's sixteen-month treatment course. *See,* e.g., Ex. 4 at 2; Ex. 8 at 46, 55; Ex. 9 at 4. During Petitioner's final PT visit contained in the medical records, on February 3, 2022, Petitioner exhibited moderate "[t]issue tautness . . . in [the] scapular muscles" and limitations with overhead ROM. Ex. 12 at 2-3. Still, Petitioner's physician noted her "good" passive and active ROM. *Id.* at 2. By this time, Petitioner had met 85-90% of her PT goals, for shoulder strength and overhead movements without restriction, respectively. *Id.* at 3. While Petitioner's rehabilitation potential was noted as "good" and the plan was for her to continue treatment with PT, the medical records do not contain additional treatment of Petitioner's left shoulder – with PT or otherwise. The medical records thus show that Petitioner's limitations in ROM continued to an extent and there is evidence in the medical records that her restricted ROM was ongoing through *at least* February 2022.

Further, the record preponderantly establishes that Petitioner's treatment course and ongoing symptoms continued through February 2022 *at the latest*, or for approximately sixteen months. Although Petitioner contends that she sought massage therapy and other subsequent treatment for her left shoulder beginning in March 2022, I cannot rely on Petitioner's word alone, unsubstantiated by contemporaneous medical records or support. Section 13(a)(1). The record shows that Petitioner ceased care following her February 3, 2022 PT visit – this *could* be evidence that her shoulder injury had resolved, or at least did not require additional treatment and/or was manageable with at-home remedies after that time. Still, Petitioner's demonstrated ongoing limitations in ROM during her February 3, 2022 PT visit provide support that her injury was ongoing through that time.

The severity and duration of Petitioner's pain, although fairly significant (at times) and moderately lengthy, is not severe enough to warrant an award equivalent to that given in surgical cases. As I noted during the expedited hearing, a petitioner who has suffered a SIRVA without surgical intervention is rarely awarded an award above $100,000.00, unless unusual facts and circumstances are present. *See,* e.g., *Leslie v. Sec'y of Health & Hum. Servs.,* No. 18-39V, 2021 WL 837139, at *2-5, *9-11 (Fed. Cl. Spec. Mstr. Jan. 8, 2021) (finding that unique factors were present, including possible bone erosion, and the inherent stress of undergoing testing with a specialist to rule out the infection warranted a higher pain and suffering award compared to other, non-surgical cases). The

8

same is not found here. Rather, Petitioner suffered a moderate SIRVA lasting over one year, that was treated with ample PT, and that was wholly distinguishable from her intervening (and concurrent) cervical injury – a factor which tends to lessen the total award. While I credit Petitioner's assertions that she continues to experience residual shoulder symptoms, this is not uncommon for SIRVA petitioners in the Program; and without specific medical record support of ongoing and/or permanent symptoms, I cannot determine that her injury extends to this day sufficient to justify a higher award.

In making her request for pain and suffering, Petitioner relied on mainly surgical SIRVA cases, with MRIs showing significant pathology, wherein an award above $100,000.00 was appropriate. *Knudson v. Sec'y of Health & Hum. Servs.,* No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018); *Collado v. Sec'y of Health & Hum. Servs.,* No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018). Petitioner's reliance on these cases does not advance her argument regarding pain and suffering because there is no evidence in the record to show that Petitioner underwent a surgery. I thus cannot equate the facts of such cases to Petitioner's circumstances. Although Petitioner's reliance on the non-surgical case, *Cooper,* is more appropriate, it is nonetheless distinguishable in that *Cooper* treated for more than two years and nine months (with specialized treatment including a chiropractor and massage therapy), and still exhibited residual pain and diminished ROM following treatment. *See* No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018). *Cooper* also successfully demonstrated that her injury greatly impacted her life – including with sailing and an active lifestyle – thus mandating a higher award. Petitioner here does not have comparable characteristics to support her requested award in excess of $100,000.00.

At the same time, Respondent's cited cases (two below his proffered amount and one above) are also somewhat unsuited – but albeit more factually analogous to Petitioner's case. The petitioner in *George*, for example, reported pain at a 4/10 level, *at most*, and by the end of treatment, she had full ROM and rated her pain at a 0-1/10. No. 18-426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 10, 2020). The *George* petitioner thus appears to have a milder injury than Petitioner's, especially compared to Petitioner's noted ongoing ROM limitations/tightness at the conclusion of treatment. Similarly, *Bartholomew* experienced "no functional limitations" and she rated her pain at a 1-4/10 following her brief, eight-month treatment course. No. 18-1570V, 2020 WL 3639805, at *2-3 (Fed. Cl. Spec. Mstr. June 5, 2020). Petitioner here still had functional limitations with reaching overhead and had documented pain at her last PT session on February 3, 2022 – 16 months post vaccination (and therefore underwent double the treatment course of the *Bartholomew* petitioner), thus justifying a higher award.

Nevertheless, and as I stated during the expedited damages hearing, I find the range of awards in the cases cited by Respondent to be mostly fair, with the *L.J.* case to be most factually analogous to Petitioner's case. No. 17-59V, 2023 WL 2137946, at *6 (Fed. Cl. Spec. Mstr. Jan. 20, 2023). That claimant exhibited moderate to severe pain and limitation in movement during her two-year treatment course, which consisted of 115 sessions of PT, 33 acupuncture sessions, 8 chiropractic sessions, an MRI, and no surgical intervention. She had "good" results from treatment, without the need for surgery (similar to Petitioner). However, the *L.J.* petitioner received a lower award (than perhaps a petitioner with that much treatment typically would), due in part to her "comorbid, unrelated symptoms" (TMJ and carpal and cubital tunnel syndromes) that were distinguishable from her SIRVA, and for which compensation was inappropriate. Still, *L.J.* received objectively more treatment than Petitioner, including double the PT sessions and chiropractor and acupuncture treatment, therefore justifying a *slightly lesser* award here. Thus, Petitioner is awarded **$77,000.00** in actual pain and suffering.[14]

I do not, however, include any component of damages for future pain and suffering. Such an award is appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). Special masters have previously declined to award a future pain and suffering award in the absence of substantial indicia of permanency. *See,* e.g., *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925, at *17 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (noting there should be "adequate medical evidence demonstrating the likelihood that petitioner's shoulder injury, more likely than not, will extend well into the future and . . . indicating that [a] shoulder injury is permanent").

Petitioner has not established that the sequela of her SIRVA continued beyond early 2022 sufficient to justify a future pain and suffering component. As stated during the expedited hearing, lingering SIRVA symptoms (which may even require additional treatment) are not equivalent to permanent deficits. Without specific medical records documenting a permanent injury, or one that is intrusive and will continue into the indefinite future, a future pain and suffering award is not warranted.

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

## Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $<u>77,000.00</u>, representing compensation for her actual pain and suffering, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.